633 So.2d 944 (1994)
Carolyn Ferrill BOZEMAN
v.
Carl F. REED and Inamarie B. Wroten.
No. 92 CA 0858.
Court of Appeal of Louisiana, First Circuit.
March 11, 1994.
*946 Charles Duchein, III, William G. Davis, Baton Rouge, for plaintiff-appellee Carolyn Ferrill Bozeman.
John O. Brown, Baker, for defendant-appellee Estate of Carl F. Reed.
Normand Pizza, Stephanie B. Laborde, Baton Rouge, for defendant-appellant State of LA Dept. Public Safety & Correction.
Frederick Haygood, Baton Rouge, for defendant-appellee Old Hickory Cas. Ins. Co.
E.A. Robinson, III, Baton Rouge, for intervenor-appellee Rudy Troy.
C. John Caskey, Michael B. Cupit, Baton Rouge, for intervenors-appellees Deborah Key, Deidra Ferrill.
Before CARTER, LeBLANC, FOIL, PITCHER and PARRO, JJ.
PITCHER, Judge.
Defendant, the State of Louisiana, through the Department of Public Safety and Corrections (DPS), appeals from a judgment finding DPS liable for damages resulting from an automobile accident which took the lives of Carl Reed (Reed), and Wayne and Marjorie Ferrill, and injured Rudy Troy (Troy), a passenger in the Reed vehicle. The basis of the claim against DPS was that DPS had issued a driver's license to Reed with the knowledge that he may have multiple sclerosis (MS), without requiring a detailed medical report at the time of the issuance of the driver's license and again when Reed's driver's license was renewed.

PROCEDURAL HISTORY
Plaintiff, Carolyn Ferrill Bozeman (Bozeman), sought to recover damages for the wrongful death of her parents, the Ferrills. Bozeman also claimed her father's damages preceding his death. Bozeman named as defendants Reed and Inamarie Wroten (Wroten). Wroten was the driver of the vehicle that allegedly forced Reed off the road.
Deborah Ferrill Key (Key), individually and as tutrix for the estate of the minor, Deidra Ferrill Crowder (Crowder)[1], intervened in this suit. Key and Crowder were also children of the Ferrills. Named as defendants in intervention were: Donald Reed, the administrator of Reed's succession; Old Hickory Insurance Company, as Reed's insurer; Wroten; and Allstate Insurance Company, as the liability insurance carrier for Wroten, and as the underinsured and uninsured motorist protection carrier for the Ferrills.
Bozeman and Key subsequently amended their petitions to add DPS as a defendant.
*947 This matter was consolidated with another suit filed by Troy.[2] Troy also intervened in the suit filed by Bozeman and named as defendant in intervention, DPS.
All claims against defendants were settled, defendants were released, and the matters were dismissed prior to trial except those against DPS and Old Hickory Casualty Insurance Company[3], who deposited into the Registry of the Court the remaining balance of its policy limits under the policy issued to Reed, as an unconditional tender for the benefit of plaintiffs in intervention, Key and Crowder.[4]
Following a bench trial, the trial court found, as a matter of fact, that the medical report submitted by Reed in 1984, in order to obtain his driver's license, was not a "detailed medical report," as required by LSA-R.S. 32:403.2. The court further found that DPS was liable, stating that "but for the failure to follow the statute and getting the detailed medical report, I don't believe this accident would have happened."
The trial court did not find that Reed was negligent because "disabled people want to maintain their independence."
The trial court also found that Troy was not negligent, as a guest passenger in Reed's vehicle, because he did not know enough about Reed's medical condition to make him aware that driving with Reed could lead to severe injury or death.
The trial court awarded damages as follows:
(1) Wayne Ferrill's pain and suffering $100,000.00
(2) Wayne Ferrill's medical expenses $22,748.80
(3) Wayne Ferrill's wrongful death claim$100,000.00
(4) Marjorie Ferrill's pain and suffering $50,000.00
(5) Marjorie Ferrill's medical expenses $9,277.50
(6) Deidra Crowder's wrongful death claim for
Wayne Ferrill$275,000.00
Marjorie Ferrill$275,000.00
(7) Deidra Crowder's loss of support $10,000.00
(8) Carolyn Bozeman's wrongful death claim for
Wayne Ferrill$225,000.00
Marjorie Ferrill$225,000.00
(9) Deborah Key's wrongful death claim for
Wayne Ferrill$225,000.00
Marjorie Ferrill$225,000.00
(10) Wayne and Marjorie Ferrill's funeral expenses$8,266.75
(11) Rudy Troy's loss of future earning capacity$50,000.00
(12) Rudy Troy's past medical expenses $73,586.00[5]
(13) Rudy Troy's future medical expenses$20,000.00
(14) Rudy Troy's pain and suffering $375,000.00
(15) Rudy Troy's loss of past earning capacity$4,500.00
From this judgment, DPS appeals, urging the following assignments of error:
1. The trial court erred in finding the State to be liable, since the plaintiffs' evidence failed to establish all of the required elements for such a finding.
2. The trial court erred in failing to find any liability on the part of the driver of the errant car, Mr. Reed.
3. The trial court erred in failing to apply the State's statutory immunity from liability for damages resulting from the discretionary *948 acts of its employees exercised in good faith.
4. The trial court erred in its application of the statutory limitation on state liability for general damages in this case.
5. The trial court erred in its determination that the eyewitnesses' testimony that differed at trial from their earlier testimony was credible, while finding that those eyewitnesses' whose testimony remained constant was found not credible.
6. The trial court erred in failing to find that Reed's passenger at the time of the accident, Rudy Troy, was not comparatively negligent.
7. The trial court erred in his unwarranted assessment of damages awarded to the Plaintiff-Intervenors/Appellees.

FACTS

THE ACCIDENT
The facts surrounding the accident are basically undisputed. Reed's vehicle was travelling south on Plank Road in the left lane. Plank Road is a four lane roadway, with a median dividing the lanes of traffic. Troy was a passenger in the Reed vehicle, but was asleep at the time of this accident. According to eyewitnesses, an unknown vehicle, later alleged to be the Wroten vehicle, was travelling in the right lane. The Wroten vehicle passed the Reed vehicle and immediately entered the left lane of traffic. At this point, there is conflicting testimony from the eyewitnesses as to whether Reed "got scared" when the Wroten vehicle passed him or whether the Wroten vehicle forced Reed off of the road. In any event, Reed's vehicle left the roadway, traversed the median and collided head on with the Ferrill vehicle, which was travelling north on Plank Road. The testimony and physical evidence indicated that Reed did not put on his brakes until immediately preceding the collision with the Ferrill vehicle.
There were conflicting opinions from the experts as to the cause of this accident. Dwayne Evans testified on behalf of plaintiffs and intervenors. He was asked the following question:
Do you have an expert opinion, sir, as to whether or not a reasonable, prudent driver who was not otherwise laboring under some kind of impaired driving ability could have taken evasive action and avoided entering into the northbound lane or precipitating a collision in this case?
Mr. Evans replied:
Yes. It is my opinion that a normal driver should have been able to take some evasive action. They could have steered to maintain a position in the median. The median is 40 feet wide at that location. It is what we would call a swell type ditch. It is low in the center for drainage purposes, but a vehicle can traverse it without a lot of trouble, particularly in dry weather or there could have been some braking applied which from the testimony I have heard there was no braking.
Ned Walton, a professional engineer, testified on behalf of DPS. It was his opinion that the cause of the accident was a vehicle that tried to make a passing maneuver and pulled back into the lane of traffic, forcing Reed from the roadway, across the median and into the opposing lane of traffic. Mr. Walton concluded that the actions of Reed were those of a reasonably prudent individual under the circumstances.
Reed was killed immediately. The Ferrills were transported to a hospital where Mrs. Ferrill died shortly thereafter. Wayne Ferrill died approximately ten days after the accident.

THE DRIVER'S LICENSE
Reed initially applied for a Louisiana driver's license in 1983. Carolyn Gonzales Innerarity, an assistant supervisor with DPS, handled Reed's application. Because Reed was physically handicapped (he was in a wheelchair), DPS requested a medical report from Reed. This medical report is a form distributed by DPS.
The medical report subsequently submitted by Reed was introduced into evidence. The report required a list of previous illnesses, and the year of occurrence. In Reed's report, multiple sclerosis was listed as a previous illness and the year of occurrence was 1959. There were several questions to be *949 answered by the physician. Some of the more pertinent questions (and answers) are as follows:
Q. Are there any amputation or skeletal deficit that can interfere with safe driving ability? (give details)
Yes __ No __
A. Don't knowI haven't seen him drive
Q. Stiff or Frail Joints?
A. Yes
Q. Describe
A. MS
Q. Spastic or Paralyzed Muscles?
A. Yes
Q. Describe
A. MS
Q. List any Orthopaedic Appliances or Supports used and for how long?
A. Uses crutches to walk
Q. Does this device provide adequate compensation for safe driving? Yes __ No __
A. [U]nknown
* * * * * *
Q. Does the patient manifest side effects from prescribed medication that might affect driving ability? Yes __ No __ (give details)
A. No
Q. Does the patient have sufficient regard for his/her personal safety as well as that of other drivers and pedestrians to drive safely? Yes __ No __ (give details)
A. Yes
Q. Is the patient likely to act on sudden impulse without regard for the consequences of the behavior? Yes __ No __ (give details)
A. No
* * * * * *
Q. In your opinion, from a medical standpoint, is it safe for patient to operate a motor vehicle? Yes __ No __
See instruction on back of form.
A. unknown
* * * * * *
Under a section entitled "Other General Remarks," the physician wrote, "This pt. has multiple sclerosis & should have a manual driver's test!!."
Charles Jordan administered a manual driving test to Reed, as directed by the physician in the medical report, and Reed scored a 98 (out of a possible score of 100). Reed had a valid Tennessee driver's license, which Mrs. Innerarity stated was a factor in the decision to issue Reed a Louisiana driver's license. Reed was issued a driver's license in January of 1984 with only one restriction, which required Reed to drive a car with an automatic transmission.
Reed's driver's license was renewed in February of 1988. According to Phyllis LeGrange, the field officer who issued the renewal license, no detailed medical report was requested from Reed at this time. However, another restriction, requiring Reed to wear corrective lens, was added to his driver's license at this time. Testimony indicated that this restriction should have been placed on Reed's initial driver's license, but it was inadvertently left off.

LIABILITY

ASSIGNMENT OF ERROR NUMBER ONE
Under a duty-risk analysis, the pertinent inquiries into a defendant's liability are:
(1) Was the conduct in question a cause in fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk and harm caused within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120, 1122 (La.1987). For plaintiff to recover under a negligence theory, all four inquiries must be affirmatively answered.

CAUSE-IN-FACT
Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct *950 is a cause-in-fact. Fowler v. Roberts, 556 So.2d 1, 5 (La.1989). To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972).
The trial court found that "but for the failure to follow the statute and getting the detailed medical report, I don't believe this accident would have happened."
The statute referred to by the trial court in its ruling is LSA-R.S. 32:403.2, which provides:
Every physically or mentally handicapped person applying for a license under the provisions of this Chapter for the first time shall attach to his application a detailed medical report, or a report from an optometrist if it is a visual defect, from a duly licensed physician indicating the severity of his disability and the limitations imposed thereby which might impair the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle. The department may waive the furnishing of said report by any person applying for a renewal license under the provisions of this Chapter, except for a person subject to R.S. 32:403.4.
The trial court's ruling is unclear as to whether DPS's failure to get the detailed medical report occurred at the time of the issuance of Reed's license in 1984, or upon the renewal of Reed's license in 1988.
The trial court initially found, as a matter of fact, that the medical report submitted by Reed in 1984 was not a "detailed medical report" as required by the statute. The trial court further noted that:
[P]resented with a report that indicated a possibility of MS, it was not discretionary but the statute would mandate that the report be sent back for a detailed report to find out, number one, if he had MS and, number two, the stage of MS, and, number three, whether it was something to be monitored or not and reviewed.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong". Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993), the Louisiana Supreme Court set forth a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See, Mart v. Hill, 505 So.2d at 1127.
Margaret Parker was the administrator of headquarter services for the Office of Motor Vehicles on January 31, 1984, when Reed was issued his driver's license. Ms. Parker testified as to the policies of the department regarding the issuance of driver's licenses to handicapped individuals. Under the department's policy/procedure statement concerning medical statements, when the medical report is returned to the officer, the report should be complete and cover in detail the disability noted. If not complete, it should be returned to the physician for completion. Ms. Parker testified that Reed's medical report was incomplete in that some questions were not answered by the physician and thus, should have been returned to the physician for completion.
This particular policy/procedure statement also addressed the section of the medical report which asks for the doctor's opinion as to the ability of the patient to safely operate a motor vehicle:[6]
The question, in regard to the doctor's opinion does not have to be answered but it would be helpful. If the doctor does not make a recommendation commitment and *951 the report contains medicines which you are unfamiliar with and/or conditions which you as a layman are unqualified to evaluate, then refer such reports to the program supervisor.[7]
In the present case, the physician gave his opinion as to the ability of Reed to safely operate a motor vehicle as "unknown."
Ms. Parker testified that she believed that if an officer was unfamiliar with a medicine or condition, then the report should have been referred to the Program Supervisor.
Mrs. Innerarity, the individual who issued Reed's driver's license, did not indicate in her testimony that she was unfamiliar with MS. However, her unfamiliarity may be presumed because MS is a progressive disease which would have necessitated that updated medical reports be required from Reed in the future. Thus, Mrs. Innerarity did not follow the department's policy/procedure statement when she did not send this report back to the physician for completion nor forward this report to a Program Supervisor because of an unfamiliar condition.
A detailed medical report may have contained more information on Reed's condition. The medical report submitted by Reed indicated only that he suffered from MS. It did not indicate the severity of his disability and the limitations imposed by his disability which might impair his ability to exercise ordinary and reasonable control in the operation of a motor vehicle. Thus, we cannot say that the trial court erred in its finding that the medical report submitted by Reed in 1984 was not a "detailed medical report," as required by LSA-R.S. 32:403.2.
Because a detailed medical report was not submitted in 1984, DPS was not in a position to know if further reports were necessary. However, the medical report that was submitted by Reed in 1984 indicated that Reed was suffering from MS. This report, although deficient, should have put DPS on notice that Reed's condition was one which needed to be monitored, and DPS should have required further medical reports upon renewal of Reed's driver's license.
It is evident that the trial court must have concluded that a detailed medical report, obtained at the time of the issuance of the driver's license or at the time of renewal, would have prevented Reed from obtaining his driver's license. A detailed medical report may have led to the discovery of the exact condition suffered by Reed. As the trial court noted in its oral reasons for judgment, the evidence presented as to Reed's condition was incomplete. It was never established that Reed suffered from MS. The evidence shows only that Reed was suffering from a severe neurological disorder, possibly MS.
The failure to establish the exact nature of Reed's condition makes it difficult to ascertain if the condition would have prevented Reed from obtaining his driver's license. Reed's medical records from the Veterans Administration (VA) were introduced into evidence. These records shed some light on Reed's condition. Several times in these records, a diagnosis of MS was given to Reed's condition. Additionally, these records indicate that on July 27, 1983, and again on January 12, 1984, Reed made a request for a form or medical statement from the VA which would enable him to obtain a driver's license. On both occasions, there was a notation in the record to the effect that this matter should be referred to neurology for an opinion because the writers of these notations, presumably doctors, did not believe that Reed should be driving a car.[8]
Dr. Austin J. Sumner, a neurologist, was the only expert to render an opinion on Reed's medical condition. Dr. Sumner reviewed Reed's VA records before rendering his opinion. Dr. Sumner could not determine from these medical records if Reed suffered from MS. However, he opined that the clinical history and findings did not support such a diagnosis, but he would not rule out this diagnosis with absolute certainty because of incomplete information. Dr. Sumner believed *952 that MS was the accepted diagnosis of some of the treating physicians, based largely on what the patient had told them.
Dr. Sumner stated that it was well documented that Reed did suffer from a severe neurological disability, which took the form of gait ataxia, limb incoordination, nystagmus and speech dysarthria. Dr. Sumner further noted that Reed's disability apparently developed acutely in 1953 and may have been due to encephalitis.[9]
Dr. Sumner concluded that, with Reed's cerebellar deficits, he could be assumed to have been able to operate a motor vehicle with reasonable safety under normal driving conditions. However, Dr. Sumner stated that, based on his experience with patients having this type of neurological disorder, Reed's ability to respond quickly and smoothly in crisis conditions would have been significantly impaired.
When faced with this evidence, we cannot say that the trial court erred in its conclusion that Reed would have been unable to obtain a driver's license had a detailed medical report been required. There was evidence in the record that two doctors, although not specialists, did not believe that Reed should drive a vehicle. When this evidence is coupled with Dr. Sumner's opinion that someone with Reed's type of neurological disorder would have had trouble responding quickly and smoothly in crisis conditions, it is not unreasonable to conclude that Reed would not have obtained his driver's license.
Assuming arguendo that the Wroten vehicle did force Reed's vehicle off of the road, the testimony and physical evidence indicate that Reed took no evasive action until immediately before the collision. It was not unreasonable to infer that Reed's disorder prevented him from responding in this situation.
DPS argues that it was not proven that Reed would not have driven if his request for a driver's license had been denied. In support of this argument, DPS relies on Guillot v. Sandoz, 497 So.2d 753 (La.App. 3rd Cir. 1986), writ denied, 501 So.2d 217 (La.1987). In the Guillot case, there was a great deal of testimony on this issue because plaintiffs argued that if defendant's license had been suspended, he would have obeyed the law and would have voluntarily refrained from driving without a license. The trial court found otherwise; however, the defendant had a bad traffic record. The trial court also referenced the many cases that he had tried for the charge of driving under suspension. The appellate court did not find error in the trial court's conclusions.
In the case at hand, there was no evidence or testimony offered to show that Reed would have driven if DPS had not issued him a driver's license. DPS argues that Reed knew of his medical problem and did not limit his driving. DPS further argues that Reed exhibited a "strong motivation" to drive in searching for a physician who would not object to his driving, after the V.A. would not recommend that he was capable of driving.
The trial court could have inferred from this evidence that Reed's tenacity in obtaining a medical report indicated that Reed was unwilling to drive without a license. Thus, this argument has no merit.
Because Reed's medical condition was a cause-in-fact of this accident, it follows that DPS's failure to obtain a detailed medical report, which would have prevented Reed from obtaining a driver's license, was also a cause-in-fact of the accident.

DUTY
Duty is a question of law. The inquiry is whether the plaintiff has any law statutory, jurisprudential, or arising from general principles of faultto support his claim. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993). A duty may be imposed by legislation or by a rule of law. Generally, the statutory scheme for licensing drivers authorizes DPS to investigate drivers and to refuse, suspend or revoke licenses. LSA-R.S. 32:414. DPS is also authorized to issue restricted licenses to handicapped persons. LSA-R.S. 32:423. DPS may also compel a licensee to submit to *953 an examination if it has good cause to believe that the licensee is incompetent or otherwise not qualified to be licensed. LSA-R.S. 32:424. These statutes are couched in terms of grants of authority, but do not contain any specific requirements governing the issuance or denial of licenses to handicapped persons. Fowler v. Roberts, 556 So.2d at 7.
LSA-R.S. 32:403.2 sets forth a specific requirement in the licensing of handicapped persons:
Every physically or mentally handicapped person applying for a license under the provisions of this Chapter for the first time shall attach to his application a detailed medical report, or a report from an optometrist if it is a visual defect, from a duly licensed physician indicating the severity of his disability and the limitations imposed thereby which might impair the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle. The department may waive the furnishing of said report by any person applying for a renewal license under the provisions of this Chapter, except for a person subject to R.S. 32:403.4.
Thus, DPS clearly had a statutory duty under LSA-R.S. 32:403.2 to obtain a detailed medical report from Reed.
Additionally, in Fowler v. Roberts, 556 So.2d at 8, the Louisiana Supreme Court recognized that DPS has a duty, when it knows that an applicant for a driver's license has a seizure disorder that may be dangerous, either at present or in the future, to adopt reasonable procedures designed to ensure safety on the highways not only in the initial issuance of a license, but also in the continuation of the authority to drive. According to Reed's medical report submitted to DPS, he had MS, a disease which can progressively worsen and possibly be dangerous either at present or in the future. Thus, the duty imposed in Fowler v. Roberts, 556 So.2d at 8, is applicable here.

BREACH OF DUTY
As noted earlier, the trial court found that DPS did not obtain a detailed medical report from Reed, as required by LSA-R.S. 32:403.2. The medical report submitted by Reed stated only that Reed was suffering from MS. There was no information in the medical report about MS or its manifestations. The report did not indicate the severity of Reed's disability or the limitations imposed by his disability which might impair his ability to exercise ordinary and reasonable control in the operation of a motor vehicle.
As noted earlier, this lack of detail in the medical report is magnified by the fact that the physician who rendered this report declined to give an opinion as to the ability of Reed to drive safely in light of this disability. Thus, DPS breached its statutory duty to obtain a detailed medical report.
DPS also breached the duty recognized in Fowler v. Roberts, 556 So.2d at 8. The procedures employed by DPS in licensing handicapped drivers do not provide reasonable safeguards for protecting motorists from the dangers that might result from a foreseeable worsening of the condition. Although the nature of Reed's disability was never definitively established at trial, DPS had been given a medical report which stated that Reed was suffering from MS, a progressive disease.
The medical report form required by LSA-R.S. 32:403.2 does not request information necessary to determine whether the applicant should be monitored after the initial issuance of the license. Also, there is no notation on the license of restrictions either requiring periodic reevaluation of a condition, which was likely to become dangerous, or preventing reissuance of the license without further review. By not implementing any safeguards to alert future licensing officers about nonapparent handicaps, DPS effectively rendered the waiver provisions of LSA-R.S. 32:403.2 meaningless. See Fowler v. Roberts, 556 So.2d at 8.
Therefore, we conclude that DPS breached its duty to adopt reasonable safeguards in licensing drivers with a medical condition that foreseeably might worsen so as to cause future dangers to motorists on the highways.

SCOPE OF DUTY
The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. *954 Rules of conduct are designed to protect some persons under some circumstances against some risks. Gresham v. Davenport, 537 So.2d 1144, 1147 (La.1989). The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d at 294. In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Hill v. Lundin, 256 So.2d at 622.
In the instant case, two duties have been identified: (1) the statutory duty to obtain a detailed medical report from handicapped persons; and (2) the duty to adopt reasonable procedures for monitoring the continuation of the driver's licensed status, when the licensee has a medical condition which foreseeably may worsen and make his driving a hazard on the highway. Both of these duties encompassed the risk that a licensed driver, who was unable to respond quickly in a crisis situation because of his medical condition, might harm other motorists when the licensed driver was faced with such a crisis. These duties are imposed for the protection of other motorists using the highway from injuries caused by a handicapped person who cannot respond to an emergency on the highway because of his medical condition.
The accident and resulting injury are easily associated with the duties set forth previously and fall within the scope of these duties.
Because all duty-risk questions have been answered in the affirmative, it follows that DPS is liable to plaintiffs and intervenors for its negligence. This assignment of error is without merit.

LIABILITY OF REED

ASSIGNMENT OF ERROR NUMBER TWO
DPS contends that the trial court erred in finding that Reed was not liable for the damage caused by this accident. In its oral reasons for judgment, the trial court stated:
I don't find Mr. Reed was negligent because disabled people want to maintain their independence. This progressed at a rate where Mr. Reed still felt he was capable of driving well, and he felt that these accidents[10] didn't then make him incapable of driving. So I don't find that he was negligent in getting his license renewed.
I do find when he got his original license he probably had some element of deception in that he shopped around. If he had had an accident between '84 and '88, I would have found him contributory negligent, but there was a superseding cause in the renewal of the license. He didn't do anything deceptive in '88.
We believe that the trial court was incorrect in its assertion that the renewal of Reed's driver's license absolves Reed of any responsibility. Although the state is responsible for taking steps to see that drivers who are physically incapable of driving are not licensed to do so, those people who know, or who in the exercise of ordinary judgment should know, that they pose a threat to the safety of themselves and others by driving when they are physically impaired from doing so, must also bear responsibility for their own actions. Tanner v. Fireman's Fund Insurance Companies, 589 So.2d 507, 514-515 (La.App. 1st. Cir.1991), writs denied, 590 So.2d 1207 (La.1992). The mere fact that the state mistakenly issues them a license does not relieve them from responsibility for their own failure to exercise ordinary care for their own safety and the safety of others by refraining from doing that which they know themselves incapable of doing in a reasonably safe manner. Tanner v. Fireman's Fund Insurance Companies, 589 So.2d at 515.
According to Dr. Sumner, Reed had been suffering from his disability since 1953. This disability occurred while he was in the service. Reed made at least two attempts at *955 the VA to get a medical report or form in order to obtain a driver's license. On both occasions, the physician who took the request referred the matter to the neurology department and noted that he/she did not believe that Reed should be driving a vehicle. Reed ultimately went to a general practitioner to get the requisite medical form.
Testimony revealed that Reed had been in at least two accidents which, according to Troy, occurred as a result of Reed's inability to control the movement in his lower extremities.
Reed knew that he was suffering from a severe disability. In the exercise of ordinary, reasonable judgment, he should have realized he posed a danger to himself and others. We find that the record supports an assessment of 50 percent fault on the part of Reed.[11]

DPS'S IMMUNITY FROM LIABILITY

ASSIGNMENT OF ERROR NUMBER THREE
In this assignment of error, DPS contends that it is immune from liability for the discretionary acts of its employees exercised in good faith, as provided for in LSA-R.S. 9:2798.1.[12] DPS states that the medical statement policy in effect at the time of Reed's application for a renewal of his driver's license provided that:
A physically or mentally handicapped person is any person having disabilities which would: impair the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle. Any disability which, in the opinion of the officer, does not affect the applicant's ability to operate a motor vehicle safely, does not require a medical report. You may waive the requirement for a medical report at renewal if the disability has been previously evaluated.[13]
DPS argues that this policy gives the field officer discretion in determining whether a medical report should be obtained before renewal. Therefore, DPS asserts that this policy is different from the policy at issue in Fowler v. Roberts, 556 So.2d at 1, and thus, immunity for the discretionary acts of the field officer is warranted here.
DPS's reliance on Fowler v. Roberts, 556 So.2d at 1, is misplaced. At issue in the Fowler case was the unwritten policy of DPS in waiving all medical reports for physically handicapped persons renewing their drivers' *956 licenses.[14] The Fowler court concluded that DPS had not shown that this blanket waiver was a result of a policy decision. When there are no standards, and renewals are granted to all applicants, the operational decision to issue a renewal is not a discretionary act. Fowler v. Roberts, 556 So.2d at 16. Therefore, the discretionary function exception to governmental liability did not apply to immunize DPS for its negligence in Fowler v. Roberts, 556 So.2d at 1.
The policy statement relied upon by DPS in this case does appear to give the field officer discretion in requiring a medical report upon renewal if the disability has been previously evaluated.[15] However, Phyllis LeGrange, the field officer who renewed Reed's driver's license in 1988, testified that there was no policy in force to check on an individual's condition. She stated that she could see that Reed was in a wheelchair and she knew that he had restrictions. Ms. LeGrange testified that she may have questioned the restrictions had Reed walked in without a wheelchair. However, Ms. LeGrange stated that there was no policy to inform her and others in her position about the extent of a licensee's condition.
Additionally, we note that, because of the failure to obtain a detailed medical report from Reed in 1984, Ms. LeGrange was not in a position to intelligently exercise her discretion in waiving the medical report upon renewal. Because of the policies, or lack thereof, in effect, Ms. LeGrange had no way of knowing that Reed's disability had not been evaluated or that Reed's disability was such that it had to be continuously evaluated.
LSA-R.S. 9:2798.1 does not protect against legal fault or negligent conduct at the operational level, but only confers immunity for policy decisions; i.e. decisions based on social, economic or political concerns. Chaney v. National Railroad Passenger Corporation, 583 So.2d 926, 929 (La.App. 1st. Cir. 1991). Although DPS's statement on medical reports may have given Ms. LeGrange discretion, in practice, she did not exercise any discretion. Additionally, any discretion she may have exercised would have been uninformed because of the policies of DPS. Thus, her operational decision to issue a renewal to Reed was not a discretionary act and not subject to immunity.
This assignment of error is without merit.

LIMITATION ON DAMAGES UNDER LSA-R.S. 13:5106

ASSIGNMENT OF ERROR NUMBER FOUR
DPS contends that the trial court erred in its interpretation of LSA-R.S. 13:5106, which sets a limit on the amount of damages recoverable against the state, or a state agency or political subdivision, in a suit for personal injury or wrongful death.
In Wilmer Chamberlain et al. v. State, through the Department of Transportation and Development, et al., 624 So.2d 874 (La. 1993), the Louisiana Supreme Court found the $500,000 ceiling on general damages set forth in LSA-R.S. 13:5106 to be unconstitutional.
Thus, this assignment of error is without merit.

CREDIBILITY OF EYEWITNESSES

ASSIGNMENT OF ERROR NUMBER FIVE
In this assignment of error, DPS appears to question the trial court's ruling as to the credibility of the eyewitnesses to the accident, yet it concludes with an argument that the trial court was incorrect in its finding of liability.
DPS argues that the plaintiff's eyewitnesses, namely Gerald Gill, Thomas Faciane, and Officer Eugene Smith, either made inconsistent statements regarding the existence of the third vehicle that allegedly ran Reed off of the road, or did not have an obstructed view of the cause of the accident, or both.
In contrast, DPS asserts that the defendant's eyewitnesses gave consistent testimonythat a car had forced the Reed vehicle off of the road. Because of the inconsistency in the plaintiffs' eyewitnesses' testimony, *957 DPS argues that they lack credibility and their testimony should be given less weight.
DPS then submits that the trial court adopted the plaintiff's expert's testimony that Reed lost control of his braking ability and thus, must have also adopted the expert's testimony that Reed maintained control of his steering throughout the episode. DPS then argues that if Reed had control over his steering, there was no reason for him to have left the road other than a third vehicle forcing him to do so. Thus, it was "implicit in the trial court's holding that he believes the Defendants' witnesses with respect to the third vehicle." Therefore, DPS does not dispute the trial court's evaluation of the credibility of these witnesses.
However, DPS maintains that, because the trial court did not comment on the credibility of the defendants' eyewitnesses' testimony, we can consider it and "when their testimony is coupled with the other evidence of the existence of the third vehicle, the trial court's finding is clearly wrong and should be overturned." DPS contends that if a third vehicle ran Reed off of the road, there is no basis for the finding of liability on behalf of DPS.
As noted in the analysis of Assignment of Error Number One, the fact that a third vehicle may have run Reed off of the road does not preclude a finding of liability. It was Reed's ability to react to the actions of the third vehicle that was in question.
Accordingly, this assignment of error is without merit.

TROY'S FAULT

ASSIGNMENT OF ERROR NUMBER SIX
DPS contends that because Troy was aware of Reed's disability, he was at fault for riding with him. Ordinarily, a driver's negligence is not imputable to a guest passenger under the theory that an automobile passenger is usually incapable of influencing the driver's behavior. Adams v. Security Insurance Co. of Hartford, 543 So.2d 480, 485 (La.1989). There have been instances when the courts have found independent negligence on the part of the guests for voluntarily exposing themselves to a known risk by entering the vehicle in the first place. For example, negligence has been imputed to a guest for riding in a vehicle knowing the driver to be intoxicated. Cormier v. Royal Indemnity Insurance Company, 279 So.2d 253 (La.App. 3rd Cir.1973).
The evidence reflects that Troy knew Reed had a disability, but did not know the nature of this disability. Troy testified that Reed told him that he was suffering from a military injury. There is evidence in the record which indicates that Troy had some knowledge that Reed's disability affected his driving. Troy stated that while Reed's steering was very good, the use of his legs was very bad. Troy testified that when Reed took his foot off of the gas, he would hit the brake real hard, and when he took his foot off of the brake, he sometimes accelerated a little too hard the first time, and it would take him at least three tries before he would adjust the speed.
Troy told of two incidents where Reed's vehicle ended up in the ditch and they had to call AAA to get them out. Because of Reed's tendency to hit the brake hard, Reed locked up the wheels on the car and, according to Troy, because the car was a front wheel drive vehicle, it fishtailed into the ditch.
The trial court asked Troy why, after these two incidents, didn't he drive or not get in the car with Reed. Troy responded that Reed never said anything about his ability to drive or that he could not drive at all. Troy stated that he observed nothing that actually put him in a great amount of fear and danger of his life at any time.
We cannot say that the trial court was clearly wrong in finding that Troy possessed a good faith belief that Reed was a safe driver, despite his disability, and thus, he was not at fault for riding with him. Tanner v. Fireman's Fund Insurance Companies, 589 So.2d at 515. This assignment of error has no merit.

*958 QUANTUM

ASSIGNMENT OF ERROR NUMBER SEVEN[16]
DPS alleges that the trial court erred in its unwarranted assessment of damages awarded to plaintiffs and intervenors.
The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corporation, et al, 623 So.2d 1257, 1260 (La.1993). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corporation, et al., 623 So.2d at 1261.
Following the standard enunciated in Youn v. Maritime Overseas Corporation, et al., we cannot say that the trial judge abused his discretion in fixing the awards of general damages. Although many rational triers of fact could have decided that lower awards were more appropriate, we cannot conclude from the entirety of the evidence in this record, viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason". Youn v. Maritime Overseas Corporation, et al., 623 So.2d at 1261.

CONCLUSION
For the foregoing reasons, the part of the trial court judgment finding no liability on the part of Reed is reversed. The judgment is amended to reduce the judgment against DPS by 50%, which we have determined to be the percentage of fault attributable to Reed. Additionally, we render judgment in favor of intervenors, Key and Crowder, against Old Hickory Casualty Insurance Company, as the liability insurer of Reed.[17]
REVERSED IN PART, AMENDED AND AS AMENDED, AFFIRMED.
LeBLANC, J., dissents and assigns reasons.
PARRO, J., concurs.
LeBLANC, Judge, dissents.
The majority concludes that the Department of Public Safety and Corrections (DPS) and Reed are liable for the damages claimed by the plaintiffs and the intervenor. The majority reasons that Reed's medical condition and DPS' failure to obtain a detailed medical report were both a cause-in-fact of the accident.
I disagree. The evidence at trial did not prove that the accident was caused by either DPS or Reed. Assuming arguendo that DPS was negligent for issuing a license to Reed, they were not at fault herein. Another vehicle, alleged to be the Wroten vehicle, passed Reed on the right and then immediately cut in front of Reed. This other vehicle drove Reed off the road and caused the accident, not DPS. Likewise, Reed was not at fault in causing the accident. The other vehicle's sudden and unexpected movement into Reed's lane of traffic was the cause of the accident.
In addition, the testimony of the plaintiff's expert, Mr. Dwayne Evans, was implausible. See, Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). Mr. Evans was asked if a reasonably prudent driver with no impairment could have taken evasive action and avoided the accident. Mr. Evans replied that his opinion was that a normal driver should have been able to take some evasive action. However, he then went on to comment on Reed's evasive action of steering into the median, finding fault with the evasive action Reed elected to use. It is inconsistent and implausible to state a driver should have taken some evasive action when faced with the emergency situation facing Reed and then conclude Reed's evasive action was deficient. *959 It is manifestly erroneous for the factfinder's findings to be based on this testimony.
Because I find no negligence by DPS, the intervention against DPS by Troy must fall.
I respectfully dissent from the reasoning and the result reached by the majority.
NOTES
[1] Deidra Ferrill reached the age of majority before this suit was tried. Additionally, Deidra Ferrill married and became Deidra Ferrill Crowder.
[2] This suit was captioned "Rudy Troy versus Inamarie Wroten, et al", Suit number 340,565, and filed in the Nineteenth Judicial District Court.
[3] DPS had filed a cross-claim against Old Hickory Casualty Insurance Company, in its capacity as insurer for Carl Reed. This cross-claim was not dismissed prior to trial.
[4] All other parties settled with Old Hickory Casualty Insurance Company.
[5] The amount was subject to a privilege in the amount of $53,804.00 in favor of Our Lady of the Lake Regional Medical Center in accordance with the statutory lien exercised by this health care provider pursuant to LSA-R.S. 9:4752.
[6] The specific question on the medical report is "In your opinion, from a medical standpoint, is it safe for patient to operate a motor vehicle? Yes __ No __

See instructions on back."
[7] DPS Policy/Procedure Statement Number 23.0
[8] According to Dr. Austin Sumner's deposition, the doctor who made the notation on July 27, 1983, was identified as Dr. Mildred B. Comeaux. The other doctor was unidentifiable. Dr. Sumner surmised that both doctors were internists.
[9] This assertion by Dr. Sumner is supported by the testimony of Reed's brother, Donald Reed, who stated that Reed had gotten sick during basic training with some type of virus which had brought on his disability.
[10] The evidence presented at trial indicated that Reed had been involved in at least two minor accidents.
[11] LSA-C.C. art. 2324 states, in pertinent part:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages....
The 1987 amendment to article 2324 changed the obligation from in solido to joint liability. Miley v. Louisiana Farm Bureau Casualty Insurance Company, 599 So.2d 791, 806 (La.App. 1st Cir.), writ denied, 604 So.2d 1313 (La.1992).
[12] LSA-R.S. 9:2798.1 provides:

A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, officers, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
[13] DPS Policy/Procedure Statement Number 23.0
[14] This policy was established through the testimony of DPS officials.
[15] This policy statement was in effect at the time of the Fowler decision.
[16] This assignment of error was urged in a supplemental brief filed with the permission of this Court.
[17] Old Hickory Casualty Insurance Company had deposited $11,600.00 into the registry of the court as an unconditional tender to Key and Crowder for any claims against Reed.