933 So.2d 803 (2006)
Allie P. BERGERON
v.
Donald WILLIAMS, Allstate Insurance Co., and State of Louisiana, Department of Public Safety & Corrections, Office of Motor Vehicles.
Patrick Pellegrin, Joycelyn Pellegrin, Individually and on Behalf of Their Minor Child, Faith Pellegrin
v.
Donald Williams, Allstate Insurance Co., and State of Louisiana, Department of Public Safety and Corrections, Office of Motor Vehicles.
Nos. 2005 CA 0847, 2005 CA 0848.
Court of Appeal of Louisiana, First Circuit.
May 12, 2006.
*805 Danny J. Lirette, Dexter A. Gary, Dennis John Elfert, Houma, Counsel for Plaintiff/1st Appellant Allie P. Bergeron.
Gregg J. Graffagnino, Houma, Counsel for Plaintiffs/2nd Appellants Patrick Pellegrin, et al.
James L. Donovan, Jr., Metairie, Counsel for Defendant/3rd Appellant Donald Williams.
Christopher H. Riviere, Nicholas J. Zeringue, Thibodaux, Counsel for Defendant/Appellee Audubon Indemnity Company.
Charles C. Foti, Attorney General, Baton Rouge, Kenneth M. Henke, Nicole A.M. Fontenot, Special Assistant Attorneys General, Lafayette, Counsel for Defendant/Appellee State of Louisiana Department of Public Safety and Corrections, Office of Motor Vehicles.
Before: PARRO, McDONALD, and HUGHES, JJ.
HUGHES, J.
This appeal arises from a personal injury suit following an automobile accident and raises issues concerning insurance subrogation claims and the trial court's assignment of fault, particularly that of the state for alleged negligent issuance of a driver's license. For the reasons that follow, we affirm the judgment of the trial court, in part, and reverse in part.

FACTS AND PROCEDURAL HISTORY
This automobile accident occurred on July 31, 1996 on La. Highway 3185 in Lafourche Parish. Plaintiffs, Allie P. Bergeron and Patrick Pellegrin, had stopped their respective vehicles on the side of the highway, while on the job for Blue Water Rubber and Gasket Company, to exchange some gaskets. Allegedly plaintiffs' vehicles were partially protruding onto the roadway. While plaintiffs were so positioned, defendant Donald F. Williams, Sr., drove his vehicle into them, causing them serious injury.[1]
*806 On July 8, 1997, Allie P. Bergeron filed suit against Donald Williams, his automobile insurer, Allstate Insurance Company (Allstate), and the State of Louisiana, Department of Public Safety and Corrections, Office of Motor Vehicles (State). In addition to the negligence of Mr. Williams, it was alleged that the State was negligent in issuing a driver's license to Mr. Williams. On July 29, 1997 Patrick Pellegrin, along with his wife Joycelyn Pellegrin, individually and on behalf of their minor daughter, Faith Pellegrin, filed a separate suit for damages naming the same defendants as Mr. Bergeron. The two suits were subsequently consolidated.
In response to the lawsuit(s), the Louisiana Workers' Compensation Corporation (LWCC) filed an intervention seeking to recover workers' compensation benefits paid to Mr. Bergeron and Mr. Pellegrin.[2] The plaintiffs' employer's UM insurer, Audubon Indemnity Company (Audubon), answered the suits denying coverage, and in the alternative, asserted contributory negligence on the part of plaintiffs, as well as a cross claim against Donald Williams and the State for their alleged negligence. The State also answered the suits and filed cross claims against Mr. Williams and Allstate for indemnity and contribution.
On December 23, 1996, Audubon deposited $1,000,000 into the registry of the trial court. In March of 1998 Audubon entered into a settlement with Mr. Bergeron for one-half of the sums on deposit with the court, and thereafter with Mr. Pellegrin and his family for the remaining one-half. All of the deposited funds were withdrawn from the court's registry by early 1999. In April of 2001, plaintiffs and the LWCC dismissed their claims against Mr. Williams and Allstate.[3]
A bench trial was held on April 26-27, 2004 and judgment was subsequently signed on September 17, 2004 assessing Mr. Williams with 70% fault and Mr. Bergeron and Mr. Pellegrin each with 30% fault (as to their respective injuries), rendering judgment in favor of Audubon against Mr. Williams for $1,000,000, and dismissing plaintiffs' claims against the State. In reasons for judgment the trial court stated that each plaintiff's damages amounted to approximately $4,000,000.
Mr. Bergeron appeals the trial court judgment and makes the following assignments of error:
1. The trial court erred when it did not follow [Bozeman v. Reed, 92-0858 (La. App. 1 Cir. 3/11/94), 633 So.2d 944], holding the Department of Motor Vehicles liable for failing to follow its own guidelines that require an applicant to be sent to an eye doctor for a detailed medical report.
2. The trial court erred when it failed to make a credibility determination between *807 two experts whose opinions directly contradict each other by calling them equally credible.
3. The trial court erred by not giving greater weight to the treating physician.
4. The trial court erred when [it] held that Mr. [Williams'] [peripheral] vision was more likely than not 80 degrees [temporal] and 50 degrees [nasal of the left eye] (as opposed to 20 degrees [temporal] and 10 degrees [nasal of the left eye]).
5. The trial court err[ed] when it failed to give Allie Bergeron the benefit of a negative inference against [the State] DMV.
Mr. Pellegrin also appeals the trial court judgment, urging the same errors as Mr. Bergeron and making the following additional assignment of error:
The trial court erred when it did not properly determine the fault of the [State] Department ... of Motor Vehicles by performing the necessary duty/ risk analysis to the case at issue.
Mr. Williams also appeals the judgment of the trial court, making the following assignments of error:
1) The trial court erred in determining Audubon had a right of uninsured motorist subrogation against Donald Williams under the terms and conditions of the policy and facts of the case.
2) The trial court erred in determining Audubon met its burden of proof at trial in establishing the essential elements of its case of subrogation against Donald Williams.
3) The trial court erred in determining that the [State] did not breach its duty to plaintiffs.
4) The trial court erred in assessing Donald Williams with 70% fault for the motor vehicle accident.
These assignments of error present essentially three issues for resolution by this court: (1) whether the trial court erred in finding the State was without fault in causing the accident at issue in this case; (2) whether Donald Williams was properly assessed with 70% fault in causing the accident; and (3) whether Audubon properly prevailed on its claim of subrogation against Donald Williams.

LAW AND ANALYSIS
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The supreme court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State, through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). See also Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, through Dept. of Transp. and Development, 617 So.2d at 882. Where factual findings are based on determinations regarding the credibility of witnesses, the trier of fact's findings demand great deference. Boudreaux v. Jeff, XXXX-XXXX, p. 9 (La.App. 1 Cir. 9/17/04), 884 So.2d 665, 671; Secret Cove, L.L.C. v. Thomas, 2002-2498, pp. 6-7 (La.App. 1 Cir. 11/7/03), 862 So.2d 1010, 1016, writ denied, XXXX-XXXX (La.4/2/04), 869 So.2d 889. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the *808 factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d at 844.

Fault of the State
In ruling that no fault was proven on part of the State, the trial court made the following findings of fact:
Policy/Procedure Statement # 9.0 states that "applicants blind in one eye, with or without corrective lenses, must have 20/40 vision in the good eye." Applicants failing to meet this standard must be referred to a vision specialist of the applicant's choice. The January 7, 1993, renewal application for a Louisiana operator's license stated that Donald Williams had no sight in his right eye and visual acuity, with corrective lenses, of 20/50 of his left eye and 20/40 of both eyes.
The evidence proves that it is more likely than not that Donald Williams' visual acuity at the time of his license renewal on January 7, 1993, was 20/50 in his left eye and 20/50 in both eyes. Dr. Van Michael Ardoin and Dr. Laurence W. Arend testified that the combined visual acuity could not be greater than the visual acuity of the only eye which has sight.
The regulations of the Department of Motor Vehicles require that an applicant with a visual acuity of 20/50 must be examined by an eye specialist in order to determine whether the applicant can safely operate a motor vehicle. Form 2002 makes the following inquiry of the examining eye specialist: "In your opinion, from a visual stand point, can this patient safely operate a motor vehicle."
In order to prove fault on the part of the Office of Motor Vehicles, the petitioners must prove by a preponderance of the evidence that an examining eye specialist would have concluded that Mr. Williams could not have safely operated a motor vehicle, and thus, the Office of Motor Vehicles would have either denied the issuance of a driver's license or issued a more restrictive driver's license.
The exhibit identified as Joint Exhibit Number 2 contains a Form 2002 completed by Dr. G.T. Tufty, dated September 9, 1996, which reflects that Mr. Williams had a corrected visual acuity of 20/40 and a horizontal visual field of 20 degrees temporal and 10 degrees nasal of his left eye. Dr. Tufty indicated no opinion as to whether Mr. Williams could safely operate a motor vehicle with corrected vision.
Dr. Van Michael Ardoin testified that in his opinion Mr. Williams could not safely operate a motor vehicle if his corrected visual acuity was 20/40 and he had a horizontal visual field of his left eye of 20 degrees temporal and 10 degrees nasal. In contrast, Dr. Paul J. Azar, Jr. testified that he would render an opinion that Mr. Williams could safely operate a motor vehicle if his corrected visual acuity was 20/40 and his horizontal field of vision was 20 degrees temporal and 10 degrees nasal in the left eye.
The Form 2002 completed by Dr. Lionel E. Boudreaux dated January 8, 1997, reflects that Mr. Williams had a corrected visual acuity of 20/40-2 and a horizontal field of vision of his left eye of 80 degrees temporal and 50 degrees nasal. Dr. Boudreaux determined that Donald Williams could safely operate a motor vehicle.
The uncontradicted testimony of Dr. Azar was that it is medically impossible for Mr. Williams' horizontal field of vision to improve from 20 degrees temporal and 10 degrees nasal in September *809 1996 to 80 degrees temporal and 50 degrees nasal on January 8, 1997. Dr. Azar concluded that either the test result of September 1996 was in error or the test result of January 8, 1997, was in error. The discrepancy of the tests could not be resolved. Dr. Azar testified that it was impossible for him to determine which test result was in error. Dr. Azar also testified that an individual with a corrected visual acuity of 20/40-2 and a horizontal field of vision of the left eye of 80 degrees temporal and 50 degrees nasal could safely operate a motor vehicle.
The August 8, 1996, medical notation of Donald Williams' treating ophthalmologist, Dr. Laurence W. Arend, indicated that Mr. Williams' horizontal field of vision was "mildly constricted." This medical record tends to support the horizontal field of vision recorded by Dr. Lionel E. Boudreaux on January 8, 1997.
Because of the discrepancy in the horizontal field of vision reported by Dr. Tufty during September 1996 and reported by Dr. Boudreaux on January 8, 1997, this court can not determine that it is more probable than not that an eye specialist would have determined that Mr. Williams had a horizontal field of vision in his left eye of 20 degrees temporal and 10 degrees nasal at the time of his application to renew his license during January 1993. It is equally probable that Mr. Williams['] horizontal field of vision was 80 degrees temporal and 50 degrees nasal.
Furthermore, even if this court could determine that it is more probable than not that Mr. Williams had a corrected visual acuity of 20/40 and a horizontal field of vision of his left eye of 20 degrees temporal and 10 degrees nasal, the trial court could not conclude that it is more likely than not that an examining eye specialist would have rendered an opinion that Mr. Williams could not operate a motor vehicle safely with corrected vision, or rendered an opinion that greater restrictions should be added to his driver's license. Doctors Ardoin and Azars [sic] rendered conflicting opinions, and Dr. Tufty declined to render an opinion. Based upon the testimony of Dr. Ardoin and Dr. Azar the trial court can not give greater weight to the testimony or opinion of either testifying expert. The trial court determines that both testifying experts were qualified by education and experience, both experts set forth reasonable facts, data and medical knowledge underlying their respective opinions and both testifying experts were credible.
The opinions of four ophthalmologists were presented to the trial court concerning whether Donald Williams could safely operate a motor vehicle. Dr. G.T. Tufty offered no opinion. Dr. Van Michael Ardoin was of the opinion that Mr. Williams could not safely operate a motor vehicle. Dr. Paul J. Azar, Jr. and Dr. Lionel E. Boudreaux were of the opinion that Donald Williams could safely operate a motor vehicle. Because of the conflicting opinions of these doctors, the trial court determines that the issue of whether Donald Williams could safely operate a motor vehicle is one which ophthalmologists may reach different opinions.
For the foregoing reasons, the trial court can not conclude that it is more likely than not [that] an eye specialist examining Mr. Williams in January 1993 would have determined that Mr. Williams could not safely operate a motor vehicle.
Policy/Procedure Statement # 9.0 states that "applicants blind in one eye, with or without corrective lenses, must have 20/40 vision in the good eye." Applicants *810 failing to meet this standard must be referred to a vision specialist of the applicant's choice.
Form 2002, the Driver Vision Test, requests that the vision specialist include suggested restrictions and limitations upon the applicant's driver's license. Policy/Procedure Statement # 9.0 provides that if an applicant blind in one eye presents a completed Driver Vision Test from any eye specialist and whose vision is 20/50 to 20/70, with or without glasses or contact lenses, the examining officer of the Department of Motor Vehicles may impose limited driving privileges, daylight driving only and/or any other restrictions recommended by the eye specialist.
Policy/Procedure Statement # 23.0 states:
Specialist reports indicating that an applicant's vision acuity in one eye or both eyes cannot be improved better than 20/50 to 20/70 may be given limited driving privileges. Restriction 03 will always be given with this acuity. In the usual case, an 01 restriction will be required and other restrictions if applicable.
The evidence proves that Donald Williams was issued a driver's license with restrictions of 01, 03 and 04. Restriction 01 requires that Mr. Williams must wear eye glasses or contact lenses while driving. Restriction 03 requires that Mr. Williams' vehicle have an outside, rearview mirror on the driver's side of the vehicle. Restriction 04 recognizes that Mr. Williams' vision could not be improved.
The evidence proves that Donald Williams was wearing corrective lenses at the time of the accident. The remaining two restrictions are not relevant to the causation of the accident.
The evidence also proves that neither the Form 2002 prepared by Dr. Tufty on September 9, 1996, nor the Form 2002 prepared by Dr. Boudreaux on January 8, 1997, included any suggested restrictions or limitations. Furthermore, Dr. Paul Azar, Jr. testified that if an applicant had a visual acuity less than 20/40, he would recommend the following restrictions:
a. No driving during night.
b. Driving only within 25 miles of home.
c. No driving on interstate highways.
d. Side rearview mirrors.
Based upon this evidence, the trial court can not conclude that it is more probable than not that an eye specialist examining Mr. Williams in January 1993 would have suggested greater restrictions than Restrictions 01, 03, and 04. Furthermore, even if greater restrictions were placed upon Mr. Williams' driver's license, it is more likely than not that such restrictions would be similar to the restrictions opined by Dr. Azar, which would not have prevented the accident. The evidence proves the accident occurred during the daylight, within 25 miles of Mr. Williams' home and on a secondary highway.
In summary, the court can not conclude that it is more likely than not that an eye specialist examining Mr. Williams in January 1993 would have determined that Mr. Williams could not safely operate a motor vehicle; nor can the court conclude that it is more probable than not that an eye specialist would have recommended greater restrictions be imposed upon Mr. Williams' driver's license. It is for these reasons that the court determines that the State of Louisiana, Department of Public Safety and Corrections, Office of Motor Vehicles *811 was not at fault in causing damages to the petitioners.
The trial court's well-reasoned decision for ruling that no fault could be assessed to the State for causing the accident at issue in this case, was based on his conclusion that it was not proven by a preponderance of the evidence that any omission by the State caused this accident. After a thorough review of the record presented on appeal, we are unable to say that a reasonable factual basis does not exist for the finding of the trial court on this issue.
To the contrary, Dr. Arend, Dr. Ardoin, and Dr. Azar all testified that, despite his visual impairment, there was no reason Mr. Williams could not have seen a vehicle stopped partially in his lane of travel if he had been looking straight ahead. Mr. Williams admitted at trial that at the time of the accident his attention was focused on a truck hauling a trailer that was approaching his vehicle in the opposite or oncoming lane of travel, and that he was not paying attention to his own lane of travel.
The trial court found that any restrictions that would have been placed on Mr. Williams' driver's license following referral to an eye specialist were already imposed by the State on the driver's license actually issued to Mr. Williams. Thus, the court found that any breach of duty by the State, in failing to order an additional eye examination prior to issuing Donald Williams' driver's license, did not cause the accident. The court found as a matter of fact that Mr. Williams could have seen the plaintiffs and their vehicles upon the roadway, but due to his inattention failed to do so, and that this inattention by Mr. Williams was the primary cause of the accident.[4] We find no error in the dismissal of the claims against the State.

Assessment of 70% Fault to Donald Williams
Mr. Williams asserts in brief to this court that the State should have been assessed some portion of fault for the accident, and that he and the plaintiffs should at least have been assessed with equal fault. Mr. Williams claims that the plaintiffs "bear an equal responsibility, having parked one vehicle slightly in the roadway and by standing a foot and a half into the road when ample room existed to be off the road."
In his reasons for assessing Mr. Williams with 70% percent fault and each plaintiff with 30% fault, with respect to his own injuries, the trial court stated as follows:
Dr. Paul Azar, Jr. testified that if Donald Williams' visual acuity was 20/50 with a horizontal field of vision of 20 degrees temporal and 10 degrees nasal of the left eye, that Mr. Williams could see a motor vehicle at a distance of one mile, and see people at a distance of one-half *812 mile. The evidence proves that the roadway was straight for a distance greater than one mile at the site of the accident. Donald Williams testified during examination by [counsel] that "I wasn't paying attention to what was going on directly in my lane." The testimony of Trooper Darryl Williams proves that Allie Bergeron and Patrick Pellegrin were standing approximately one foot, five inches within the travel lane occupied by Mr. Williams' vehicle.
For these reasons, the trial court concludes that Donald Williams was at fault in the causation of the accident.
* * *
... The testimony of Trooper Darryl Williams proves that the shoulder of the highway at the site of the accident had adequate width for Mr. Bergeron and Mr. Pellegrin to park their vehicles and still have room to stand on the shoulder rather than on the roadway.
Based upon this evidence the court determines that Allie Bergeron and Patrick Pellegrin were also at fault in the cause of the accident. The court determines that Donald Williams was seventy percent at fault, and Allie Bergeron and Patrick Pellegrin were each thirty percent at fault.
As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault; therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Duncan v. Kansas City Southern Railway Co., XXXX-XXXX, pp. 10-11 (La.10/30/00), 773 So.2d 670, 680. Based on the evidence presented to the trial court, we cannot say the assessment of 70% fault to Donald Williams in causing this accident was error.

Subrogation Claim of Audubon Against Donald Williams
Mr. Williams asserts on appeal that the trial court erred in awarding Audubon $1,000,000 against him on its claim of subrogation. In support of this assertion, Mr. Williams argues that the Audubon policy provisions do not provide subrogation under the circumstances of this case, and that alternatively, Audubon failed to prove all the elements of its subrogation claim.
With respect to uninsured/underinsured motorist coverage, LSA-R.S. 22:680(4) provides for subrogation in favor of the insurer as follows: "In the event of payment to any person under the coverage required by this Section and R.S. 22:1406 and subject to the terms and conditions of such coverage, the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made, including the proceeds recoverable from the assets of the insolvent insurer." (Emphasis added.)
The general provisions of the Audubon commercial automobile policy issued to plaintiffs' employer provided as follows:
TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US
If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.
The policy endorsement entitled "Louisiana Uninsured Motorists Coverage  Bodily *813 Injury" contained the following additional provisions:
CHANGES IN CONDITIONS
The CONDITIONS are changed for UNINSURED MOTORISTS COVERAGE as follows:
* * *
3. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO U.S. does not apply to vehicles described in paragraph b. of the definition of "uninsured motor vehicle".

TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO U.S. is changed by adding the following:
If we make any payment and the "insured" recovers from another party, the "insured" must hold the proceeds in trust for us and pay us back the amount we have paid. We shall be entitled to subrogation only after the "insured" has been fully compensated for damages by another party.
(Emphasis added.) An "uninsured motor vehicle" is defined by the policy as follows:
"Uninsured motor vehicle" means a land motor vehicle or trailer:
a. For which no liability bonds or policy at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged;
b. Which is an underinsured motor vehicle. An underinsured motor vehicle means a land motor vehicle or trailer to which a liability bond or policy affording coverage for "bodily injury" applies at the time of the accident but the amount paid for "bodily injury" under that bond or policy to an "insured" is not enough to pay the full amount the "insured" is legally entitled to recover as damages;
c. For which an insuring or bonding company denies coverage or is or becomes insolvent; or
d. Which is a hit-and-run vehicle and neither the driver nor owner can be identified....
(Emphasis added.)
An insurance policy is an agreement between the parties and should be interpreted by using ordinary contract principles. If the language in an insurance contract is clear and unambiguous, the agreement must be enforced as written. Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993). See also Jenkins v. CNA Ins. Co., 98-0022, pp. 4-5 (La.App. 1 Cir. 12/28/98), 726 So.2d 71, 74. The parties' intent, as reflected by the words of the policy, determines the extent of coverage. Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. Id. Exclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured. Id.
The subrogation available to an uninsured motorist carrier under LSA-R.S. 22:680(4) is by its own provisions "subject to the terms and conditions of such coverage." The terms and conditions of the Audubon policy clearly and unambiguously state that the "TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO U.S." does not apply to vehicles described in paragraph b. of the definition of "uninsured motor vehicle." Paragraph b. describes "an underinsured motor vehicle." Since Mr. Williams' vehicle was an underinsured motor vehicle, Audubon, in the provisions of the policy of insurance it issued, covering the plaintiffs, opted not to obtain the contractual subrogation of claims against underinsured motorists. *814 Therefore, we find that the trial court erred in making an award to Audubon against Mr. Williams on the basis of subrogation.

CONCLUSION
For the reasons assigned, we reverse the judgment of the trial court in favor of Audubon Indemnity Company against Donald Williams, and hereby dismiss the claims asserted by Audubon Indemnity Company against Donald Williams; in all other respects, the judgment of the trial court is affirmed. Audubon Indemnity Company is to bear the costs of Donald Williams' appeal; the remaining appellants are to bear their own costs of this appeal.
REVERSED IN PART; AFFIRMED IN PART.
NOTES
[1] Mr. Bergeron suffered a traumatic amputation of his left leg below the knee, dislocation of his right leg, a crushed pelvis, a fractured left shoulder, a fractured neck, and other internal injuries. Mr. Bergeron required numerous post-accident surgeries to treat his injuries, including an above-the-knee surgical amputation of the left leg. Mr. Pellegrin suffered a closed head injury, broken legs, broken left arm, broken pelvis, and broken ankle. He also required numerous post-accident surgeries.
[2] Following resolution of this issue by summary judgment against the LWCC, their claims were dismissed as to the plaintiffs and Audubon. The judgment of the trial court finding that the Audubon policy excluded reimbursement of workers' compensation benefits either directly under the policy or from the insureds was affirmed by this court in Bergeron v. Williams, 99-0886 (La.App. 1 Cir. 5/12/00), 764 So.2d 1084, writ denied, XXXX-XXXX (La.9/15/00), 768 So.2d 1281.
[3] Mr. Williams does not assert that the fact that plaintiffs had subrogated some part of their claim for damages to Audubon was concealed from him.
[4] We find the case cited by appellants, Bozeman v. Reed, 92-0858 (La.App. 1 Cir. 3/11/94), 633 So.2d 944, to be distinguishable on its facts and therefore not authoritative in the instant case. In Bozeman v. Reed, the motorist/tortfeasor was suffering from multiple sclerosis, which is a progressively degenerative disorder that can impact the sufferer's ability to respond quickly and smoothly to a motorist's crisis. 633 So.2d at 952. In that case, the trial court found that the State's failure to request a detailed medical report on the tortfeasor's known condition prior to renewal of his driver's license, was a cause-in-fact of the accident; this court could find no manifest error under the facts of that case. 633 So.2d at 949-50. Causation was found in Bozeman v. Reed relating the omission of the State to the occurrence of the accident at issue. However, in the instant case, the factfinder determined that the inattention of the motorist/tortfeasor, along with the negligence of the plaintiffs in positioning themselves on the edge of the roadway, caused the accident; any omission by the State was not found to be a causative factor in the accident.