978 So.2d 927 (2007)
SPECIALIZED COMMERCIAL LENDING, INC.
v.
MURPHY-BLOSSMAN APPRAISAL SERVICES, L.L.C., Rick Murphy, A.R. Blossman, III, and ABC Insurance Company.
No. 2007 CA 0100.
Court of Appeal of Louisiana, First Circuit.
November 2, 2007.
Rehearing Denied January 17, 2008.
*929 Andrew A. Braun, Daniel G. Rauh, New Orleans, LA, for Plaintiff/First Appellant Specialized Commercial Lending, L.L.C.
David S. Daly, Metairie, LA, for Defendant/Second Appellant Chicago Insurance Company.
Joseph G. Glass, William J. Guste, IV, Metairie, LA, for Defendant/Appellee Murphy-Blossman Appraisal Services, L.L.C.
Michael P. Bienvenu, Baton Rouge, LA, Counsel for Defendant/Appellee Richard L. Murphy.
Robert S. Stassi, New Orleans, LA, for Defendant/Appellee A.R. Blossman, III.
Brian B. Brown, Mandeville, LA, In Proper Person for Third Party Defendants/Appellees, Brian B. Brown, Brian B. Brown Construction, Inc., and Bacmar Enterprises, Inc.
Angela P. Miles, Mandeville, LA, In Proper Person for Third Party Defendant/Appellee, Angela P. Miles.
Before WHIPPLE, GUIDRY, and HUGHES, JJ.
HUGHES, J.
This is an appeal from a judgment in favor of a lender and against a real estate appraisal company for the loss of collateral resulting from the latter's failure to verify that homes were being constructed as represented, for which loan funds were advanced. For the reasons that follow, we affirm the trial court judgment in part and reverse in part.

FACTS AND PROCEDURAL HISTORY
Between 1998 and 1999, Brian B. Brown and companies he controlled, Brian B. Brown Construction, Inc. and Bacmar Enterprises, Inc. (hereinafter collectively as "Brown"), began borrowing money from Specialized Commercial Lending, L.L.C. ("Specialized") for the purchase of lots and construction of residences thereon, as a business venture for sale of the homes after construction. Specialized financed the construction of some fifty homes by Brown. Between October and December of 2000, Specialized advanced funds, secured by mortgage on the immovable properties at issue, to Brown for the construction of ten houses that were never built. During this time, the firm of Murphy-Blossman Appraisal Services, L.L.C. ("Murphy-Blossman") was hired to complete verifications and/or certifications that relevant phases of construction of the houses had been completed, which were prerequisite to payment of four separate construction "draws" or loan disbursements on each of the ten houses. As part of the verification/certification process, Murphy-Blossman was required to visually *930 inspect construction in progress and then submit written verification in conjunction with Brown's draw requests that certain construction phases had been completed. Upon receipt of a verification/certification from Murphy-Blossman, Specialized disbursed loan funds to Brown. Murphy-Blossman submitted written verification and certification to Specialized that construction phases for each of the ten homes at issue had been completed, when in fact no work had been done. The only explanation offered by Murphy-Blossman for the incorrect documentation was that Murphy-Blossman office manager Lisa Torres failed to properly locate the subject properties during her visual inspections and was misled to view other homes under construction rather than the ten lots that were vacant.
Specialized pursued the instant lawsuit against Murphy-Blossman and Chicago Insurance Company ("Chicago"),[1] for damages it sustained as a result of the breach of Murphy-Blossman's contractual agreement, as an independent, licensed real estate appraisal company, to verify and certify completion by Brown of requisite construction phases. Specialized contended that it relied to its detriment on Murphy-Blossman's incorrect representations and certifications, in making loan advances to Brown. Murphy-Blossman filed a third party demand against Brown and Brian Brown's associate, Angela Miles.
Following trial of the matter, the trial court rendered judgment apportioning fault as follows: 40% to Brown and Angela Miles; 40% to Murphy-Blossman; and 20% to Specialized. Specialized's damages were determined to be $654,497.02, with $261,798.81 to be paid by Murphy-Blossman and Chicago, and $392,698.21 to be paid by Brown and Angela Miles.
Specialized has appealed and contends the trial court erred in assigning it a percentage of fault, and in apportioning fault equally between Murphy-Blossman and Brown/Miles. Chicago has also appealed and maintains that the trial court erred in: (1) denying Chicago's motion for summary judgment and granting Specialized's motion for summary judgment on coverage, finding that there was coverage under the Chicago policy for Specialized's claims; (2) refusing to dismiss Specialized's claims against Chicago at the close of Specialized's cases; (3) finding that the Chicago policy covered the acts of Murphy-Blossman; (4) casting Chicago jointly, severally, and solidarily liable with Murphy-Blossman; and (5) not dismissing all negligent supervision claims at the close of Specialized's case.

LAW AND ANALYSIS
Apportionment of Fault
Specialized asserts the trial court erred in assigning it a percentage of fault in this case, arguing that it should not have been found at fault for loss that Murphy-Blossman had a professional duty to protect it from. Alternatively, Specialized asserts that the trial court had no reasonable basis in the record and was clearly wrong in finding that it was negligent and contributed to its own loss. Finally, Specialized asserts that Murphy-Blossman should have been apportioned a greater share of fault than Brown.
As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault; therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. *931 Bergeron v. Williams, XXXX-XXXX, p. 12 (La.App. 1 Cir. 5/12/06), 933 So.2d 803, 812 (citing Duncan v. Kansas City Southern Railway Co., XXXX-XXXX, pp. 10-11 (La. 10/30/00), 773 So.2d 670, 680, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001)). Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising, it to the highest or lowest point respectively that is reasonably within the trial court's discretion. Duncan v. Kansas City Southern Railway Co., XXXX-XXXX at p. 11, 773 So.2d at 680-81 (citing Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, 611).
The trial court issued written reasons for judgment, which set forth his findings of fact as follows:
The facts presented indicate Murphy[-]Blossman was hired to perform construction draw verifications for the [Brown] properties. . . .
First to testify in that regard was Lisa Torres, the office manager for Murphy-Blossman during the time of the alleged wrong-doing. Ms. Torres stated that Murphy-Blossman was aware Specialized would rely on the construction draw verifications, as they were intended to insure "the builder was building on the right piece of property." And, if a mistake were made, then the lender would suffer serious damage. . . .
Ms. Torres was originally hired by Murphy-Blossman as a part-time receptionist. Six (6) months later she was promoted to a full-time office manager. In addition to general filing, answering the phone, managing accounts payable and payroll, she also handled construction draw verifications. There was a great deal of testimony as to whether Ms. Torres was properly trained to perform and, whether she was supervised during the course of performing, the construction draw verifications. Ms. Torres stated she was trained to do the construction draws by Mr. Murphy, Mr. Blossman, and Todd Fitzmorris (all appraisers with Murphy-Blossman). She stated she not only did construction draws for Specialized, but for other banks which were funding houses for Brian Brown as well. Ms. Torres indicated that when she was unsure of the location of a home-site, she would contact Angela Miles (a business associate with Brian Brown) for directions to the properties.
It was revealed in her testimony that, on many construction draw verification sheets, Ms. Torres did not recognize her signature. (Forgery was implied.) On cross-examination however, Ms. Torres struggled to maintain consistency in her testimony when asked to identify her handwriting and signature. . . . She did say that if she had the original construction draw, she could be certain. When asked whether she knew where the original files were being stored, she responded negatively.
Mr. Wayne LeBlanc was next called to testify. He identified himself as the chief financial advisor for Specialized since January 1, 1998 until the present.[[2]] Mr. LeBlanc further stated he had been a CPA since 1975. His general duties were to authorize, monitor and collect customer loans. The business of Specialized, Mr. LeBlanc explained, was to make commercial loans to contractors and clothing manufacturers.

*932 Mr. LeBlanc described Brian Brown as a customer and "quasi-friend." He stated Specialized financed approximately fifty to sixty (50-60) homes for Mr. Brown and his companies. In connection with this financing, Specialized hired Murphy-Blossman to perform appraisals of the lots for Mr. Brown's homes and of the value of completed homes slated for construction. Mr. LeBlanc stated early on he handled the construction draw verifications himself. Upon a request by Mr. Brown for a certain draw, Mr. LeBlanc testified that he would personally visit the property and verify that the stages of construction were complete. This became increasingly burdensome for Mr. LeBlanc as the volume increased. The procedure was then modified to the submission of photos, rather than a personal visit, for verification of each phase of construction. Finally, Murphy-Blossman was retained to perform the construction draw verifications as well as the appraisals on the properties. This last procedural modification began in approximately September, 2000.
Mr. LeBlanc was questioned about the circumstances of discovering Specialized had advanced money for houses which were not built. He stated he was actually with Mr. Brown, returning from a trip to Florida, when Mr. Sanderson (owner of Specialized) called and asked him, "Where are these ten _____ houses?" Mr. LeBlanc said he, in turn, questioned Mr. Brown, who retorted, "That's impossible!" Finally, Mr. LeBlanc stated that when he questioned Murphy-Blossman about the draw verifications for the missing ten houses, they offered him no explanation for what had transpired.
When cross-examined, Mr. LeBlanc admitted Specialized is a sub-prime lender. Further, he stated he knew Mr. Brown could not go to a prime lender and get competitive rates. Still, Specialized was not concerned about Mr. Brown's credit because the loans were asset-based (based upon the property value and, of course, verified construction). Mr. LeBlanc testified he relied upon Murphy-Blossman to ensure that each phase of construction was complete.
Also called to testify in Plaintiffs case-in-chief was Richard Murphy. He explained that in the practice with Murphy-Blossman, he largely performed residential appraisals and Mr. Blossman did commercial appraisals. He stated however that both he and Mr. Blossman jointly handled office work such as hiring and firing, and supervision of staff. He acknowledged there were no set procedures or training on how to prepare construction draws. And, he testified he did not know how or when Lisa Torres began to perform construction draw verifications on her own, but admitted that her construction draw verifications were not monitored.
Mr. Murphy explained that for each property, an original appraisal was performed. A file was then created. That file would contain all information regarding the property, its location and the subsequent verifications for each phase of construction. The file would have been brought along when approving a phase of construction, but the file wasn't always needed to confirm the location of the construction site. When asked why he was unable to produce the original files for the ten (10) properties at issue here, Mr. Murphy explained that the discovery had gone from law firm to law firm during the pendency of this suit. He stated he never "intentionally removed the ten files." Regardless of the reason for the disappearance of the files, *933 Mr. Murphy speculated the files contained only the original appraisals and Murphy-Blossman's invoice.
Mr. Thomas Finnegan was called to testify. He was qualified by the Court as an expert in construction draw inspection and verification services. After educating himself with facts through deposition testimony, Mr. Finnegan opined that the training of Lisa Torres was inadequate. He stated, "It is never prudent to rely on the builder, or his associate, to indicate the location of the property." Finally, in his opinion, the construction draw verification forms were "just plain sloppy."
The Court was then to hear from Ms. Angela Miles. But, before the Court would allow her testimony, Counsel was required to advise Ms. Miles of her right to refuse to testify, as guaranteed by the Fifth Amendment to the Constitution. Despite that instruction, Ms. Miles elected to testify.
Ms. Miles explained she had a full and complete Power of Attorney for Brian Brown which authorized her to act in his behalf for many transactions. From August through December, 2000, Ms. Miles stated she ran the job sites, did purchasing and scheduling of contractors and executed, pursuant to the Power of Attorney, closings on vacant lots. She also ordered the pre-construction appraisals and requested the construction draws through Murphy-Blossman. And, Ms. Miles extolled [sic] a romantic, as well as business relationship with Brian Brown.
Ms. Miles admitted the following: She sent construction draw requests for houses which were not built; this was accomplished by requesting money for houses with the same lot (but different square) numbers as houses which actually were being built; she intentionally misled Lisa Torres to the wrong lots when the draw requests were being verified; she was not aware that anyone at Murphy-Blossman knew about the fraud, but Brian Brown certainly knew the scheme; the money advanced by Specialized for these ten (10) properties was used to satisfy accruing interest on loans Mr. Brown secured for a development in Florida. When asked by the Court whether Ms. Torres was receiving a "kickback" for the erroneous draw verifications, Ms. Miles stated, "I didn't know Lisa well enough for that." Ms. Miles confirmed that the construction draws at issue here were all made subsequent to September, 2000 (after Murphy-Blossman was engaged to verify the draw requests).
What was also conveyed through the testimony of Ms. Miles was that the relationship between Mr. Brown, Mr. LeBlanc and Mr. Sanderson was a bit more than a business acquaintance. Ms. Miles stated that the three men with their wives (and she with Mr. Brown) once traveled to South America. Also, she stated Mr. LeBlanc was financially involved in the Florida development with Mr. Brown. Ms. Miles firmly believed Mr. LeBlanc knew about Mr. Brown's scheme on the ten (10) properties in Mandeville. Yet, this testimony is unreliable and speculative. It is not considered by the Court.
The remaining witnesses called to testify merely confirmed what was previously stated. Todd Fitzmorris, an appraiser with Murphy-Blossman[,] agreed that Lisa Torres'[s] construction draw verifications were not supervised, but that he had no knowledge about what happened regarding the ten (10) lots at issue. Robin Ketron, a bookkeeper for Specialized[,] stated the construction draw requests which she received from Murphy-Blossman were not reviewed by her or her superiors, except *934 to ensure signatures on the appropriate lines.
[Footnote omitted.]
Based on these findings of fact, the trial court reached the following legal conclusions:
The rule of law for the determination of fault in this case is negligence. Thus, the standard of care to which the defendant Murphy-Blossman, must conform should first be established. Real estate appraisers are required by law to provide an accurate appraisal to clients and others who rely on their reports. This duty also extends to construction draw verifications or certifications performed by appraisers. [Alley v. Courtney, 448 So.2d 858, 859 (La.App. 2 Cir.), writ denied, 450 So.2d 360 (La.1984) (cited with approval in Thomas v. Livingston Parish Sheriffs Office, XXXX-XXXX, p. 5 (La.App. 1 Cir. 9/23/05), 923 So.2d 662, 668)].
Pursuant to the above standard, Murphy-Blossman owed a duty to Specialized to properly perform the construction draw verifications for the Brown loans. The question then before the court is whether this duty was breached.
The evidence presented by the employees of Murphy-Blossman painted a grim picture of the procedure which was followed for the submission of the construction draw verifications. It was uncontroverted that Lisa Torres handled the construction draws at issue here. She admitted she had no real training to perform such draws and that she was not supervised. Moreover, she stated when issuing draws, she relied on information provided to her by Ms. Miles, in particular the location of the subject properties. The testimony of Mr. Murphy is as equally damning. Mr. Murphy admitted he had "no set policies for any procedures," and stated repeatedly that he "did not know," and that he "wasn't sure what happened here," and that he didn't know ["]what happened to the files."
Counsel for Specialized argued strenuously for the imposition of the "adverse presumption" regarding the ten (10) missing files for the properties a: issue. Under Louisiana law, if a litigant fails to produce evidence available to him, and a reasonable explanation is not made for that course of action, there is a presumption that the production of such evidence would have been adverse to his cause. [Wise v. Bossier Parish School Board, XXXX-XXXX, p. 12 (La.6/27/03), 851 So.2d 1090, 1098].
Because no original files or photographs were ever produced to Specialized as requested on several occasions through discovery, then Specialized wants this Court to presume such evidence would have been adverse to Murphy-Blossman. This Court acknowledges the theory of "adverse presumption" but in light of the Court's ruling (infra), such presumption against Murphy-Blossman need not be imposed. Alternatively, this Court accepts Mr. Murphy's statement that, even had the files been produced, they would contain only an appraisal and an invoice. This statement in itself is rather adverse to Murphy-Blossman (since evidence was presented to show that draws were certainly made on the subject properties).
That being so, this Court does not need an expert's testimony to be convinced that the practices employed by Murphy-Blossman were imprudent. Yet, this Court accepts the testimony of Mr. Finnegan in support of a finding that Murphy-Blossman breached the standard of care in failing to supervise the construction draw verifications *935 which Ms. Torres single-handedly submitted to Specialized. Furthermore, this Court finds that Murphy-Blossman is liable for negligent or tortious acts performed by its employee, Lisa Torres.
* * *
The Louisiana Civil Code provides that a tortfeasor is only liable for his degree of fault. (La.C.C.arts. 2323-2324.) . . .
* * *
These provisions dictate that a party (or non-party) can be liable only in accordance with the respective degree of fault which is assigned. Applying these articles to the facts of this case, the Court must consider fault not only of the defendant, but also as to the plaintiff, and the third-party defendant, Brian Brown.
As a rule[,] lending institutions, such as Specialized, are held to a higher standard of care commonly imposed upon fiduciaries. However, pursuant to the facts before this Court, imposing a higher duty of care upon Specialized would be inappropriate. Specialized's actions in this case are assessed from the perspective of an investor. In other words, the duty imposed upon Specialized is simply what a reasonably prudent person would do to protect its own investment.
Wayne LeBlanc stated he did not insure the correctness of the construction draw verifications submitted by Murphy-Blossman. In fact, he said he completely relied on the expertise of Murphy-Blossman when advancing each draw. He testified he never once visited the ten properties at issue in this case until, of course, the sham was discovered.
This Court simply cannot accept the argument made on behalf of Specialized that Murphy-Blossman was to be their "watch-dog," while Specialized turned a blind eye as it issued countless checks in the hundreds of thousands of dollars. . . . Granted the facts are uncontroverted that Murphy-Blossman was hired by Specialized to perform the construction draw verifications, and that they received a payment for that duty in the amount of fifty to one hundred ($50.00-$100.00) dollars for each verification. . . . Still, Mr. LeBlanc stated he advanced each draw request which came in, whether or not he felt the requests were sloppy or hastily prepared.
In an apparent attempt to bolster credibility for Specialized, Robin Ketron (the bookkeeper) stated she would look for "red flags" on the construction draw forms. When asked to explain a "red flag" however, Ms. Ketron was unable to do so. Moreover, Mr. LeBlanc knew Mr. Brown's credit rating prevented him from borrowing from prime lenders.[[3]] *936 Despite that fact, Mr. LeBlanc was unconcerned because the loans were "asset-based." Why Mr. LeBlanc did not then feel compelled to retain at least some: responsibility for insuring he had an "asset" to protect his loan is the reason this Court simply cannot absolve Specialized of fault. Despite the hiring of Murphy-Blossman, no reasonably prudent person would have failed to monitor assets for loans approaching one million dollars.
Through the testimony of Angela Miles, the fraudulent scheme which caused the losses suffered by Specialized has been fully disclosed. In this connection, it is argued that the fault of the third party defendants, since it is based on fraud, should supersede any apportionment of fault to other parties. Cited in support of this argument is the civilian tradition which recognizes "the bad faith of one party always renders the error of another party excusable." . . .
* * *
. . . [H]ow convenient it is to apply that statement to these facts to exonerate Murphy-Blossman from liability. Certainly in a Utopian society, this Court would not hesitate to do so. Unfortunately, under these facts, we are dealing with less than Utopian creatures. The players here are experienced businessmen who are not unaccustomed to turning profits on formidable amounts of money. To allow Murphy-Blossman to rest on defenses such as naivete and innocence is unfortunately not a suitable finding for the current state of business affairs. That being so, this Court can only apply the theories . . . offhandedly to the facts of this case. Granted, Ms. Miles and Mr. Brown lied to Murphy-Blossman. But, the facts disclosed at trial show Richard Murphy and A.R. Blossman, III did a lot of work for Mr. Brown. They were aware of his less-than passable credit.[[4]] Thus, Murphy-Blossman's responsibility superseded Mr. Brown's ability to defraud him, and the reasonably prudent person would have known that.
[Footnotes omitted.]
The court went on to assess fault to the parties as previously indicated: 40% to Brown/Miles; 40% to Murphy-Blossman; and 20% to Specialized.
After a thorough review of the record presented on appeal, we find the trial court's findings of fact were, in the main, amply supported by the record. Certainly, significant evidence was offered to show that construction draw certification forms sent by Murphy-Blossman to Specialized were lacking in detail, which might have provoked a more cautious lender to further inquiry. Most compelling is the evidence that the construction draws for each house purportedly under construction were inordinately close together, a fact that was evident from the certification forms.
The time period between the date the first draw was requested by Specialized and the day the fourth and final construction *937 draw was requested (for which Murphy-Blossman verified the requisite construction had been completed and submitted certification of same to Specialized) was for each of the ten properties as follows: 19 days, 22 days, 25 days, 25 days, 32 days, 32 days, 32 days, 38 days, 39 days, 49 days (not counting the day each first draw was requested). Prior to the funding of each first draw on each lot, the following construction tasks were required to be completed and/or construction components installed (as listed on the construction draw certification form completed by Murphy-Blossman): lot filled, slab formed, termite tubes, re-bars, visquene, subsurface plumbing, and tape around copper. By the time the fourth draw could be funded, each task required prior to the second draw, third draw, and fourth draw was to have been completed. For the second draw, these were: framing, "rough in" plumbing, "rough in" electrical, heating and air conditioning, "blacked in," roofing installed, and exterior doors and windows installed. For the third draw, these were: brick or siding, sheetrock (hung, taped, and textured), soffit and fascia hung, and insulation installed. For the fourth draw, these were: painting completed, flooring installed, trim completed and painted, hardware installed, appliances set in place, light fixtures, A/C compressor installed, cabinets installed, house thoroughly cleaned, plumbing finished, driveway or walks finished, and ready for occupancy.
When Specialized's Vice President and Chief Financial Officer, Wayne LeBlanc, was asked about the exceedingly short time period between the first and fourth draws and questioned as to whether he was alarmed that for one of the houses the span between the first and fourth draw was only 19 days, Mr. LeBlanc replied, "I just must have missed it, man." Mr. LeBlanc's only justification was that Brian Brown had bragged to him that he could build a house in 30 days. Mr. LeBlanc also stated that Brown often built houses next door to one another, implying that houses could be built faster when crews could be employed on multiple houses.
A review of the draw request certification forms submitted by Murphy-Blossman to Specialized reveals that the forty draw requests on the ten properties at issue were made as follows: on October 27, 2000  7 first draw requests; on October 31, 2000  1 first draw request; on November 2, 2000  2 second draw requests; on November 6, 2000  2 second draw requests; on November 7, 2000  3 second draw requests; on November 10, 2000  3 third draw requests; on November 15, 2000  2 first draw requests and 3 third draw requests; on November 21, 2000  2 second draw requests, 1 third draw requests, and 2 fourth draw requests; on November 27, 2000  2 third draw requests; on November 28, 2000  3 fourth draw requests; on December 4, 2000  1 second draw request and 2 fourth draw requests; on December 5, 2000  1 fourth draw request; on December 7, 2000  1 third draw request and 1 fourth draw request; and on December 19, 2000  1 fourth draw request. Thus, Brown was submitting draw requests, on average, every 4 days.
Mr. LeBlanc testified that his main concern was that a Murphy-Blossman representative had included the location of the property, signed, and dated the form certifying that verification of the draw prerequisites had been completed. Mr. LeBlanc testified that he was not concerned as to *938 whether every block had a check in it.[5]
At the close of Mr. LeBlanc's testimony, the trial judge questioned him regarding the Murphy-Blossman draw certification forms submitted to Specialized, stating, "[T]hese look to be at best absolutely sloppy. You're telling me you would accept this sloppy work and hand out money to people? That was your practice? I mean serious money?" Mr. LeBlanc replied, "Based upon the approvals of the draws from experts that we had hired."
The trial court obviously found as a matter of fact that Specialized's reliance on the Murphy-Blossman draw certification forms was negligent. Under the particular facts and circumstances of this case, we cannot say the trial court committed manifest error in finding that Specialized was 20% at fault in accepting, without question, draw certifications from Murphy-Blossman that were on their face problematic and called for additional inquiry. Accordingly, we affirm that portion of the trial court's judgment assessing Specialized with 20% fault.
Additionally, Specialized maintains on appeal that the trial court erred in apportioning fault as between Murphy-Blossman and Brown/Miles, asserting that Murphy-Blossman should have been assessed with a greater percentage of fault than Brown/Miles. The evidence presented at trial established that had either Brown/Miles or Murphy-Blossman acted in a non-culpable manner with respect to the Specialized, the loss inflicted would have been prevented entirely. So, we cannot say the trial court's equal assessment of fault between Murphy-Blossman and Brown/Miles was error in this case. We find no merit in Specialized's contention that Murphy-Blossman, rather than Brown/Miles, should have been assessed with the "lion's share" of fault in this case.
We note that in the trial court judgment Murphy-Blossman was assessed with 40% of the damage amount, $261,798.81, while Brown was assessed with 40% fault but ordered to pay 60% of the damage amount, $392,698.21. Evidently, the Brown judgment amount was adjusted so as to comply with LSA-C.C. art. 2323(C), prohibiting reduction of a plaintiffs award in favor of an intentional tortfeasor.
Louisiana embraces a broad civilian concept of "fault" that encompasses any conduct falling below a proper standard, including intentional torts. Landry v. Bellanger, XXXX-XXXX, p. 6 (La.5/20/03), 851 So.2d 943, 949. Thus, the application of Louisiana's pure comparative fault system requires that the fault of both negligent and intentional tortfeasors be assessed by the factfinder. See Frazer v. St. Tammany Parish School Board, 99-2017, pp. 5-9 (La.App. 1 Cir. 12/22/00), 774 So.2d 1227, 1231-34, writ denied, XXXX-XXXX (La.3/23/01), 787 So.2d 1001. Accordingly, in the instant case assessment of fault to both the negligent tortfeasor, Murphy-Blossman, and to the intentional tortfeasors, Brown and Angela Miles, was required under the law. However, comparative fault is not applicable to reduce the recovery of damages by a negligent plaintiff who has been injured partly as a result of the fault of an intentional tortfeasor. Landry v. Bellanger, XXXX-XXXX at p. 14, 851 So.2d at 953-54 (the supreme court *939 went on to hold that Section C applies only when a plaintiffs contributory fault consists of negligence and does not apply where the plaintiffs fault is intentional); Young v. First National Bank of Shreveport, 34,214, pp. 29-30 (La.App. 2 Cir. 8/22/01), 794 So.2d 128, 147, writ denied, 2001-2642 (La.1/4/02), 805 So.2d 209, writ denied, 2001-2762 (La.3/22/02), 811 So.2d 936. See also LSA-C.C. art. 2323(C). Nevertheless, whereas in the instant case a trial court finds negligence on the part of the plaintiff and on the part of one defendant while finding another defendant has committed an intentional culpable act, the recovery of the negligent plaintiff may be reduced in accordance with his own assessed fault vis-à-vis the negligent tortfeasor, while no reduction is made in favor of the intentional tortfeasor. See Babb v. Boney, 30,443, p. 6 (La.App. 2 Cir. 4/8/98), 710 So.2d 1132, 1135.
Thus, we find no error in the assessments of fault and judgment amounts in this case and affirm this portion of the trial court judgment.
Interpretation of Chicago Insurance Policy
On appeal, the assignments of error put forth by Chicago have as a common basis the argument that the insurance coverage provided by Chicago to Richard L. Murphy did not provide coverage for the fault of Murphy-Blossman, either as a result of its own negligence or vicariously for the negligence of its employee, Lisa Torres.
An insurance policy is an agreement between the parties and should be interpreted by using ordinary contract principles. If the language in an insurance contract is clear and unambiguous, the agreement must be enforced as written. Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993). See also Jenkins v. CNA Insurance Company, 98-0022, pp. 4-5 (La. App. 1 Cir. 12/28/98), 726 So.2d 71, 74. The parties' intent, as reflected by the words of the policy, determines the extent of coverage. Such intent is to be determined in accordance with the general, ordinary, plain, and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. Id. Exclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured. Id.
In this case, Chicago issued Mr. Murphy both primary insurance coverage in a "Real Estate Licensee Professional Liability Insurance Policy," with a policy limit of $100,000 for each wrongful act and $300,000 as an aggregate limit, and excess insurance in a "Real Estate Licensee Excess and Augmented Professional Liability Insurance Policy," with a policy limit of $1,000,000.[6] The primary policy was issued to "Richard L. Murphy" and the excess policy was issued to "Richard L. Murphy dba Murphy & Associates."[7]
*940 The primary policy provided, "We will pay on behalf of the insured[[8]] all sums which the insured shall become legally obligated to pay as `damages'[[9]] because of a `wrongful act'[[10]] in the rendering or failure to render `real estate services.'" The term "real estate services" was defined as follows:
"Real estate services" means services performed or advice given by the insured while:
a. Selling or listing real estate;
b. Managing real estate; or
c. Appraising real estate.
Appraising real estate means the process of establishing market value, investment value or other defined value of a specific item of real estate when such services are conducted by a licensed or certified real estate appraiser.

"Real estate services" include the following services performed or advice given by the insured in connection with the activities listed as items a, b, and c, above:
1) Consultant or counselor;
2) Notary public, or
3) Handling funds for an escrow or trust account when such funds are:
a) In the form of United States currency, certified check, guaranteed check or money order;
b) Held separate from your funds; and
c) Distributed in their entirety within twelve (12) months from the date received.
"Real estate services" does not include services performed or advice given by the insured in connection with activities as a:
Mortgage banker or correspondent;
Escrow agent (other than the handling of funds described in item 3. above);
Construction Manager;
Property Developer.
[Emphasis added.]
Chicago asserts that the negligence of Murphy-Blossman and/or Lisa Torres was not covered under the policy definition of "real estate services," either because it did not fall within one of the covered categories listed in the policy, or because the construction draw certifications were not performed by a "licensed or certified real estate appraiser" as required under the policy provisions. Because we agree with the latter assertion, we find it unnecessary to address the former, or the remainder of Chicago's contentions.
The unambiguous policy language pertinent to this case provides coverage only for "services performed or advice given" while an insured is: selling or listing real estate, managing real estate, or appraising real estate. While the negligent activities of Murphy-Blossman did not involve selling, listing, or managing real estate, arguably, the verification and certification of construction could be considered as being related to or a part of the prior appraisal process undertaken by Murphy-Blossman.[11] *941 Nevertheless, the negligence of Lisa Torres in performing the certifications on these ten lots was not insured by Chicago since it was undisputed that Lisa Torres was not a "licensed or certified real estate appraiser."
Further, while Murphy-Blossman was found to be vicariously liable for the negligence of its employee, Lisa Torres, it was also found negligent in failing to properly train and/or supervise Lisa Torres in the performance of her employment duties. Clearly, the failure to properly train and/or supervise employees does not fall within the definition of "real estate services," but rather would more appropriately fall within an administrative or managerial type function, traditionally insured under general liability insurance. Chicago did not provide commercial general liability insurance under the policies at issue.
Consequently, applying the principles of insurance contract interpretation, we conclude the unambiguous provisions of the Chicago policies at issue herein do not provide coverage under the facts of this case for the fault of Murphy-Blossman. Accordingly, we reverse that portion of the trial court judgment finding coverage under the Chicago policies.

CONCLUSION
For the reasons assigned herein, the judgment of the trial court is affirmed in part, and reversed in part. Each party is to bear his own cost of this appeal.
AFFIRMED IN PART; REVERSED IN PART.
GUIDRY, J., concurs in the result.
NOTES
[1] Murphy-Blossman owners A.R. "Trey" Blossman, III and Richard L. "Rick" Murphy were also made defendants to the suit, but were later dismissed with prejudice.
[2] Mr. LeBlanc actually stated that he retired from Specialized because of personal disability in March or April of 2004.
[3] The testimony of Mr. LeBlanc did not actually evidence a knowledge of Brown's "credit rating;" rather, Mr. LeBlanc indicated that Specialized's business as a sub-prime lender catered to businesses with less than "exemplary credit." Mr. LeBlanc also testified that Brown's reason for coming to Specialized as a lender was because re had "tapped out on his lending limits with [local banks] . . . [and] he wanted to build more houses." When Brown began his credit relationship with Specialized, Mr. LeBlanc testified that he provided Specialized with a financial statement prepared by a well-respected CPA. That financial statement indicated that among Brown's assets was a personal residence valued at 1.5 million dollars. However, Mr. LeBlanc testified that the residence had been appraised by Murphy-Blossman, and when Brown encountered his financial difficulties, it was sold under foreclosure brought by a first mortgage holder; it was then revealed to have had a sales value of less than $700,000. Mr. LeBlanc further testified that until the fraudulent scheme at issue was uncovered in 2001, Brown had never missed a payment on his debt service to Specialized. On the issue of a credit rating, Mr. LeBlanc stated only that he was unconcerned about Brown's credit rating because the loans his company made to Brown were "secured" by the immovable property at issue.
[4] The trial testimony of Richard Murphy does not contain any testimony concerning what his knowledge was as to Brown's credit-worthiness. Mr. Murphy related only that he did not "think" the company received payment for the appraisals performed on the ten properties at issue in this case. Mr. Blossman was not questioned at trial concerning Brown's credit status.
[5] Specialized's bookkeeper, Robin Ketron, also testified that her main concern in accepting a Murphy-Blossman draw certification was that the property was adequately identified and the form was signed by a Murphy-Blossman representative; variations in signatures or an absence of a check in every box were not considered by Ms. Ketron to be important.
[6] "Coverage A" under the excess policy was dependant on a finding of coverage under the primary policy, as indicated in the policy language, which provides: "We will pay on behalf of the insured all sums that the insured shall become legally obligated to pay as `damages' which are . . . [b]ecause of injury or `damage' for which insurance is afforded by the `underlying insurance.'" The parties do not dispute that if there were coverage under the primary policy, then there would be coverage under the excess policy.
[7] We note that Mr. Murphy's address was listed on the policy as: 3000 26th Street, Suite D, Metairie, Louisiana, which Mr. Murphy testified at trial was the address for his individual office. The address for Murphy-Blossman was: 1011 North Causeway, Mandeville, Louisiana.
[8] The policy provided that "[t]he word `insured' moans any person or organization qualifying as such under WHO IS AN INSURED (SECTION II)." An "insured" was further defined as including "[y]our employees and assistants while acting on your behalf," and "[t]he organization you work for or represent but only with respect to the conduct of your `real estate services.'"
[9] "Damages" were defined by the policy as "compensatory `damages' which an insured becomes legally obligated to pay," and did not include "fines, sanctions or penalties against any insured, or the return or reimbursement of fees for `real estate services.'"
[10] "Wrongful act" was defined by the policy as "a negligent act, error or omission."
[11] The testimony presented at trial established that with respect to the properties at issue, Murphy-Blossman had appraised the properties and that the verification of construction for purposes of the construction draws was undertaken as something of an extension of that appraisal process. The evidence showed that the verifications and certifications completed by Murphy-Blossman were maintained in the appraisal file created for each separate property. Further, the process of verifying that the construction had been conducted in accordance with the plans and specifications appraised by Murphy-Blossman could be considered a part of the process of establishing the value of the real estate at issue.